**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SECALT S.A.; TRACTEL, INC.,
          *Plaintiffs-Appellants,*

v.

WUXI SHENXI CONSTRUCTION
MACHINERY COMPANY, LTD.,
          *Defendant-Appellee.*

No. 10-17007

D.C. No.
2:08-cv-00336-JCM-
GWF

SECALT S.A.; TRACTEL, INC.,
          *Plaintiffs-Appellants,*

v.

WUXI SHENXI CONSTRUCTION
MACHINERY COMPANY, LTD.,
          *Defendant-Appellee.*

No. 11-15066

D.C. No.
2:08-cv-00336-JCM-
GWF

OPINION

Appeal from the United States District Court
for the District of Nevada
James C. Mahan, District Judge, Presiding

Argued and Submitted
November 17, 2011—San Francisco, California

Filed February 7, 2012

Before: Michael Daly Hawkins, M. Margaret McKeown, and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge McKeown

1269

## COUNSEL

Scott S. Christie (argued), McCarter & English, Newark, New Jersey, for the plaintiffs-appellants.

James C. Martin, Charles H. Dougherty, Jr., Donna M. Doblick (argued), Clay P. Hughes, Reed Smith LLP, Pittsburgh, Pennsylvania; Carina M. Tan, Reed Smith LLP, Palo Alto, California; Ivy Y. Mei, The Law Offices of Ivy Y. Mei, Mountain View, California, for the defendant-appellee.

## OPINION

McKEOWN, Circuit Judge:

Although "[p]rotection of trade dress, no less than of trademarks, serves the [Lanham] Act's purpose," *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 774 (1992), that protection does not extend to designs that are functional. We consider here whether a traction hoist manufactured by Secalt, S.A., and Tractel, Inc. (collectively "Tractel") qualifies for trade dress protection. We agree with the district court that Tractel did not meet its burden to establish nonfunctionality and affirm the grant of summary judgment in favor of Jiangsu Shenxi Construction Machinery Co. ("Jiangsu"). We affirm the district court's award of attorney's fees to Jiangsu upon finding that this is an "exceptional" case meriting fees. While the line delineating "exceptional" cases under the Lanham Act may be murky, this action falls squarely within the realm of exceptional cases contemplated by the Act.

## FACTUAL AND PROCEDURAL BACKGROUND

Tractel manufactures and sells the Tirak traction hoist, which is used typically for commercial building projects and external maintenance, like window washing. These devices are commonly affixed to suspended platforms to power the platforms up and down stationary wire ropes. Upon discovering that Jiangsu, a Chinese competitor, exhibited similar looking hoists at a trade show in Las Vegas, Tractel brought suit claiming that Jiangsu's hoists infringed the trade dress of the Tractel traction hoist. The complaint included three counts against Jiangsu: trade dress infringement under the Lanham Act; federal unfair competition; and related state law trade dress and unfair competition claims. This photograph reflects the design of Tractel's hoist.



Tractel alleges that the external design elements of its hoist deserve trade dress protection. It claims as its trade dress: 1) a cube-shaped gear box with horizontal fins; 2) a cylindrical motor mounted in an off-set position on the cube and partially overhanging the edge of the cube; 3) the cylindrical motor

including vertical fins on a lower portion and a generally smooth sheet metal upper cover having a control descent lever and top cap positioned over the upper end and supported by rectangular legs; 4) a rectangular control box cantilevered to the motor by a square shaped member, the control box positioned over the cube, the control box including controls thereon; and 5) a rectangular frame.

In the district court, Jiangsu argued that Tractel failed to establish that its claimed trade dress was nonfunctional. Noting that "[e]ven when viewed in the most favorable light, the admissible evidence submitted by Tractel fails to suggest that the alleged Tirak trade dress is non-functional," the district court granted summary judgment in favor of Jiangsu. The district court also found the action to be "exceptional" under the Lanham Act and awarded both fees and costs to Jiangsu.

## DISCUSSION

### I.　Trade Dress Protection and Nonfunctionality

**[1]** Trade dress protection under federal law is designed to promote competition. *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 28 (2001). Such protection, however, "must subsist with the recognition that in many instances there is no prohibition against copying goods and products." *Id.* at 29. Rather, "[t]he physical details and design of a product may be protected under the trademark laws only if they are nonfunctional . . . ." *Clamp Mfg. Co. v. Enco Mfg. Co.*, 870 F.2d 512, 515 (9th Cir. 1989) (citing *Vuitton Et Fils S.A. v. J. Young Enters.*, 644 F.2d 769, 772 (9th Cir. 1981)). Were a product's functional features protected, then "a monopoly over such features could be obtained without regard to whether they qualify as patents and could be extended forever." *Disc Golf Ass'n v. Champion Discs, Inc.*, 158 F.3d 1002, 1006 (9th Cir. 1998) (citation omitted).

Under the Lanham Act, Congress imposes a presumption of functionality, and plaintiff bears the burden of proving non-

functionality. 15 U.S.C. § 1125(a)(3) ("In a civil action for trade dress infringement under this chapter for trade dress not registered on the principal register, the person who asserts trade dress protection has the burden of proving that the matter sought to be protected is not functional."). Therefore, Tractel, as the "one who seeks to establish trade dress protection must carry the heavy burden of showing that the feature is not functional, for instance by showing that it is merely an ornamental, incidental, or arbitrary aspect of the device." *TrafFix*, 532 U.S. at 30. In cases of product design, the Supreme Court has counseled "that design, like color, is not inherently distinctive." *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 212 (2000).

**[2]** In conducting the functionality analysis, which is a question of fact, we must be mindful that "'[f]or an overall product configuration to be recognized as a trademark, the entire design must be nonfunctional.'" *Leatherman Tool Grp. v. Cooper Indus.*, 199 F.3d 1009, 1012 (9th Cir. 1999) (quoting *Clamp*, 870 F.2d at 516); *see also Tie Tech, Inc. v. Kinedyne Corp.*, 296 F.3d 778, 786 (9th Cir. 2002) (foreclosing a finding of nonfunctionality where "'the whole is nothing other than the assemblage of functional parts'" (quoting *Leatherman*, 199 F.3d at 1013)). "De facto" functionality means that the "design of a product has a function, i.e., a bottle of any design holds fluid," whereas "de jure" functionality means that the "product is in its particular shape *because it works better in this shape*." *Leatherman*, 199 F.3d at 1012 (citation omitted). "[B]efore an overall product configuration can be recognized as a trademark, the entire design must be arbitrary or non de jure functional." *Id.*

**[3]** Tractel claims that the overall exterior appearance of its hoist is nonfunctional because the hoist's design—wherein the component parts meet each other at right angles—demonstrates a "cubist" look and feel. Its engineering manager testified that the hoist's "cube shape was part of the design look" and that the fins were supposed to be "modern"

and "flashy." Tractel touts the "singular exterior design" that sets its hoist apart from those of its competitors by presenting evidence that its hoist has "more square edges" and a "rectangular look."[1] Tractel's fundamental misunderstanding—which infects its entire argument—is that the presumption of functionality can be overcome on the basis that its product is visually distinguishable from competing products. While such distinctive appearance is necessary, it is here insufficient to warrant trade dress protection.

Our decision in *Leatherman* is determinative and underscores the fallacy of Tractel's approach. The court in *Leatherman* was faced with competing multifunction pocket tools that resembled the classic "Swiss army knife." 199 F.3d at 1010. The defendant's products contained only "small but not particularly visible differences" from the plaintiff's product. *Id.* Nonetheless, we reversed a jury finding of infringement because:

> To be sure, the [pocket tool] has an appearance, as every physical object must. There is no evidence, however, that anything about that appearance (other than the Leatherman name) exists for any non-functional purpose. Rather, every physical part of the Leatherman [tool] is de jure functional. . . . [T]he evidence showed, as in *Textron*, that "the product is in its particular shape *because it works better in this shape*."

*Id.* at 1013 (quoting *Textron, Inc. v. U.S. Int'l Trade Comm'n*, 753 F.2d 1019, 1025 (Fed. Cir. 1985)).

**[4]** Just as in *Leatherman*, Tractel's hoist has an exterior appearance, as every object must; but there is no evidence that anything about the appearance exists for any nonfunctional

---

[1]The briefs and record in this case were filed under seal; however, nothing we discuss in this opinion is proprietary or confidential.

purpose. Rather, every part is de jure functional. A piece of industrial machinery with "rectangular" components that meet each other at "right angles," without more, is wholly insufficient to warrant trade dress protection. It is not enough to say that the design portrays a "cubist" feel—so does a square table supported by four legs. The fins may be attractive but they serve a functional purpose. And the cube-shaped gear box is simply housing. Except for conclusory, self-serving statements, Tractel provides no other evidence of fanciful design or arbitrariness; instead, here, "the whole is nothing other than the assemblage of functional parts, and where even the arrangement and combination of the parts is designed to result in superior performance, it is semantic trickery to say that there is still some sort of separate 'overall appearance' which is non-functional." *Id.*

[5] As evidence of nonfunctionality, Tractel points to a United States design patent issued to Griefzug Hebezeubau GmbH. To be sure, the Supreme Court has recognized that a "producer can ordinarily obtain protection for a design that *is* inherently source identifying (if any such exists) . . . by securing a design patent or a copyright . . . ." *Wal-Mart*, 529 U.S. at 214.**²** Design patent protection, which is limited, extends only to "any new, original and ornamental design for an article of manufacture." 35 U.S.C. § 171; *see also* Manual of Patent Examining Procedure § 1504.01 (8th ed. rev. July 2010). Such protection extends only to "the appearance of the article and not structural or utilitarian features."

[6] Courts have uniformly held that a design patent, without more, is insufficient to prove that a design is nonfunc-

---

**²**Tractel also argues that its trade dress serves as a source identifier to the public. This argument misses the mark because "[w]hether a feature is functional has no direct bearing on whether it plays a source-identifying role. The functionality analysis should not be conflated with the inquiry into whether the purchasing public associates the dress with a particular source." *Clicks Billiards Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1260 (9th Cir. 2001) (internal quotation marks omitted).

tional. *See* McCarthy on Trademarks and Unfair Competition, § 7.93 (4th ed. 2010) ("While a design patent is some evidence of nonfunctionality, alone it is not sufficient without other evidence."). In *Krueger Int'l, Inc. v. Nightingale Inc.*, then-District Judge Sotomayor collected cases and concluded that "[a]t best, a design patent can only help rebut the functionality defense; it cannot do the whole job of proving inherent distinctiveness. The plaintiff still needs to show that, in its market at the time of the alleged infringement, the design is both ornamental and deserving of trade dress protection." 915 F. Supp. 595, 605 (S.D.N.Y. 1996), *overruled on other grounds by Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373 (2d Cir. 1997). Other than conclusory assertions about the design patent, Tractel offers no other relevant evidence. Because Tractel is unable to present evidence of nonfunctionality, it fails to demonstrate that the exterior design and appearance of its hoist deserve trade dress protection.

Tractel's reliance on the design patent is further problematic for a number of reasons. To begin, Tractel baldly asserts its claimed trade dress is protected by the patent and yet offers no analysis and proffers no evidence of any connection with the design or the designer. Nor is there any evidence the patent has been assigned or licensed to Tractel, or that Tractel has any relationship to the patent. The chain becomes even more attenuated based on the issuance of the patent in the year 2003, more than twenty years after Tractel started selling its hoist in the United States. *See* 35 U.S.C. § 102(b) ("A person shall be entitled to a patent unless . . . the invention was . . . on sale in this country, more than one year prior to the date of the application for patent in the United States."). And finally, Tractel's purported trade dress does not even match the design in the patent.[3] For example, the patent drawings do

---

[3]We recognize that were this a design patent infringement case, the figures in the patent, not Tractel's commercial product, would be the baseline design. *See Payless Shoesource, Inc. v. Reebok Int'l Ltd.*, 998 F.2d 985, 990 (Fed. Cir. 1993) ("Under the test set forth by the Supreme Court [in

not contain legs, whereas Tractel explicitly claims support "by rectangular legs" as a distinctive feature. In short, Tractel doesn't have a leg to stand on via the design patent.

Tractel also criticizes the district court for failing to cite the four *Disc Golf* factors in analyzing functionality: "(1) whether the design yields a utilitarian advantage, (2) whether alternative designs are available, (3) whether advertising touts the utilitarian advantages of the design, and (4) whether the particular design results from a comparatively simple or inexpensive method of manufacture." *Disc Golf*, 158 F.3d at 1006. These factors certainly illuminate the functionality analysis, but instead of aiding Tractel, they further support the district court's finding of functionality.

**[7]** *Disc Golf* teaches that "[a] product feature need only have *some* utilitarian advantage to be considered functional." *Id.* at 1007. Tractel's claims of its cubist visual effect are undermined by its own engineering witness who testified that numerous features of the claimed trade dress serve a function —round motors can accommodate the rotating cylindrical shaft, vertical fins can dissipate heat, and the top cap can keep water and debris from falling into the fan. Absent is any evidence that these functional aspects of the trade dress were adorned with arbitrary, ornamental embellishments; instead, Tractel claims that the exterior design has nothing to do with how the hoist functions internally and that customers consider how the hoist performs, not how it looks. This argument undercuts Tractel's position by demonstrating that hoists are fungible goods for which customer preferences do not depend on visual features. *See Tie Tech*, 296 F.3d at 785 (differentiat-

---

*Gorham Co. v. White*, 81 U.S. (14 Wall.) 511 (1871)], infringement of a design patent requires a showing that the accused design is substantially the same as the claimed design. . . . Proper application of the *Gorham* test requires that an accused design be compared to the claimed design, not to a commercial embodiment.").

ing between features that constitute the benefit that the consumer wishes to purchase, which is unprotected, from artificial embellishment, which has trademark significance). Since at least some (and in this case significant) utilitarian advantage stems from the visual appearance, the presumption of functionality remains intact.

**[8]** Under the second *Disc Golf* factor, a lack of alternative designs favors a finding of functionality. It is undisputed that Tractel's competitors market and sell hoists that look similar, but not identical, to the Tractel hoist. This does not help Tractel because "[e]ven though many of the [competitor's hoists] likely are highly functional and useful, none of them offer *exactly* the same features as [Tractel's hoist]." *Leatherman*, 199 F.3d at 1013-14. For example, a particular alternative design might be smaller or larger than Tractel's hoist. As such it may be preferred by a customer looking either for a easily maneuverable hoist, or a heavier duty hoist. The same considerations apply to differences in maintenance costs and ease of storage. Unfortunately for Tractel, "a customer's preference for a particular functional aspect of a product is wholly distinct from a customer's desire to be assured 'that a particular entity made, sponsored, or endorsed a product.' Whereas the latter concern encompasses the realm of trademark protection, the former does not." *Tie Tech*, 296 F.3d at 786-87 (quoting *Leatherman*, 199 F.3d at 1012).

**[9]** Next, advertising that touts the utilitarian advantages of the Tractel design points to functionality. Tractel's advertising specifically claims that the angular construction of its hoist "[a]llows for easier maintenance. [The hoist] does not roll off of the table. Service people love it." This direct utilitarian advantage of the angular design favors functionality.

We consider last whether the particular design results from a comparatively simple or inexpensive method of manufacture. Since manufacturing costs are generally the same in the hoist industry, about $2,000 per hoist, this factor is neutral.

Jiangsu contends that alternative designs are subsumed by "competitive necessity" and therefore need not be considered. As the Supreme Court noted in *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 850 n.10 (1982), a product feature is functional "if it is essential to the use or purpose of the article." The Court later explained that "[w]here [a product's] design is functional under the *Inwood* formulation there is no need to proceed further to consider if there is a competitive necessity." *TrafFix*, 532 U.S. at 33. Thus, a determination of functionality under *Inwood* may be seen as short circuiting some of the *Disc Golf* factors. *See Au–Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 457 F.3d 1062, 1071 (9th Cir. 2006) ("As to functionality, we read the Court's decision [in *TrafFix*] to mean that consideration of competitive necessity may be an appropriate but not necessary element of the functionality analysis.").

**[10]** Nonetheless, even if the *Disc Golf* factors are somewhat more expansive than the *Inwood* formulation, they do not aid Tractel in meeting its burden of demonstrating nonfunctionality. Tractel's hoist is, at bottom, a utilitarian machine with no indication that the visual appearance of its rectangular exterior design is anything more than the result of a simple amalgamation of functional component parts. Absent are any indicia of arbitrary or fanciful design. "To uphold a finding of infringement here . . . would suggest that the general appearance of almost *any* unpatented product rarely if ever could be copied faithfully. That is not the law." *Leatherman*, 199 F.3d at 1011. The form of Tractel's hoist follows its function, making the hoist a classic example of "de jure" functionality. We affirm the district court's determination that Tractel did not present evidence sufficient to create a triable issue as to the nonfunctionality of its claimed trade dress.

## II.  EXCEPTIONALITY AND ATTORNEY'S FEES

**[11]** Section 35(a) of the Lanham Act provides that "[t]he court in exceptional cases may award reasonable attorney fees

to the prevailing party." 15 U.S.C. § 1117(a). An action may be considered exceptional "[w]hen a plaintiff's case is groundless, unreasonable, vexatious, or pursued in bad faith." *Stephen W. Boney, Inc. v. Boney Servs.*, 127 F.3d 821, 827 (9th Cir. 1997) (internal citation and quotation marks omitted). The district court concluded that "the plaintiffs were unable to provide the court with any evidence to support their assertion that the trade dress was not functional." It further found that:

> "[T]he mere absence of bad faith on [Tractel's] part does not render it ineligible for attorney's fees." [Tractel does] not provide the court with any evidence that there were "debatable issues of law and fact" with regards to the trade dress. They assert rights in the design patent to rebut the defendant's 'unreasonable' argument, yet fail to produce evidence that they own the design patent or that the true owner assigned the rights to them.

In light of these factors, Tractel's continued prosecution of its claims was held by the district court to be "unreasonable."

We review de novo the district court's legal determination that an action is "exceptional" under the Lanham Act; however, once an action is determined to be exceptional, the district court's decision to award attorney's fees is reviewed for an abuse of discretion. *Earthquake Sound Corp. v. Bumper Indus.*, 352 F.3d 1210, 1216 (9th Cir. 2003).

**[12]** The line distinguishing exceptional cases from non-exceptional cases is far from clear. It is especially fuzzy where the *defendant* prevails due to plaintiff's failure of proof. We have previously held that an action is exceptional under the Lanham Act if the plaintiff has no reasonable or legal basis to believe in success on the merits. *See Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1156 (9th Cir. 2002) ("The false advertisement claim was groundless and unreasonable

because the statements in the advertisements at issue were true and [plaintiff] had no reasonable basis to believe they were false."); *id.* ("the dilution of trademark claim was groundless and unreasonable because it had no legal basis"). In other words, exceptional cases include instances where plaintiff's case is frivolous or completely lacking in merit.

**[13]** Although Tractel does not ultimately prevail, were it able to provide some legitimate evidence of nonfunctionality, this case would likely fall on the unexceptional side of the dividing line. When summary judgment motions were heard, the parties had been in discovery for almost two years, taken multiple depositions, and compiled substantial documents. Yet, Tractel could not identify the aesthetic value of the exterior design, and was reduced to arguing that it was pursuing a "cubist" look and feel even though its own witnesses undercut this argument.

**[14]** In addition, months before the summary judgment proceedings, the Northern District of Georgia, in a separate action regarding the same claimed trade dress, denied Tractel's motion for a preliminary injunction because "there's nothing about [Tractel's] design that is arbitrary, incidental or ornamental." The court went even further: "Each of the features of the alleged trade dress, based on the evidence that I've heard, serve a function in the operation of the hoist. . . . There's an utter failure of evidence . . . ." Although the Georgia decision was made at the preliminary injunction stage, Tractel was on notice that even on *its* own motion for relief, there was "an utter failure" of proof. Given that evidence of nonfunctionality would be primarily in Tractel's possession, its inability to demonstrate nonfunctionality in the Georgia case seriously undercuts its arguments that it was raising "debatable issues of law and fact" in this action. *Stephen W. Boney, Inc.*, 127 F.3d at 827.

As it turned out, the testimony at summary judgment in Nevada played out just like in Georgia—there was an utter

failure of proof. Tractel failed to "provide the court with any evidence that there were 'debatable issues of law and fact' with regards to the trade dress." From its own witnesses, Tractel at best offered either unsupported or conclusory claims about the design. Fatal to its claim was the testimony of its own witnesses who honestly laid out the functional nature of the design. Lacking was any evidence, like engineering notebooks or testimony from the designers, about design or aesthetics. Even more devastating was the testimony of third-party witnesses called by Tractel who laid bare the claim of nonfunctionality. For example, they testified that the fins play an important function of dissipating heat and are not for aesthetics. Likewise, the shape of the hoist is practical because it fits in confined construction sites and it is "more efficient and more compact" than some of the other hoists on the market. One of Tractel's distributors, who was also a hoist industry professional, summed up the functional reality of the Tractel hoist:

> [T]he entire design is predicated on function from what I've seen, and again as with most hoist manufacturers, every element on there is critical to the design otherwise they wouldn't waste the money or the weight which again comes back to the weight is the key component. So in my opinion every element on there is important to the function.

Faced with this evidence, the slim reed offered by Tractel is a design patent for a hoist that does not mirror the Tractel hoist. Tellingly, Tractel does not offer evidence that it has any claim or rights in the patent or even that it is a valid patent. Although we do not favor a mini patent trial within the trade dress context, Tractel cannot simply raise the specter of a third-party patent and hope it will serve to support nonfunctionality. We need not decide whether, under different circumstances, a trade dress claimant could rely on its own identical design patent to overcome the lack of any other evidence of nonfunctionality, though the case law suggests other-

wise. Nonetheless, Tractel cannot even make that claim. Simply pointing to a design patent with similarities (and differences) to its claimed trade dress is insufficient to raise a "debatable issue of law or fact."

**[15]** Although the timing of Tractel's suit could be considered suspicious, such preemptive suits are not uncommon in intellectual property matters. Even if Tractel had an ulterior anti-competitive motive, had it made a colorable claim, that factor would weigh in our analysis. *See Mennen Co. v. Gillette Co.*, 565 F. Supp. 648, 657 (S.D.N.Y. 1983), *aff'd*, 742 F.2d 1437 (2d Cir. 1984) (attorney's fees justified where suit was filed "as a competitive ploy"). Instead, Tractel's action appears to be a conscious, albeit misguided, attempt to assert trade dress rights in a non-protectable machine configuration. We affirm the district court's finding that this is an exceptional case meriting attorney's fees under 15 U.S.C. § 1117(a).

## III.   AWARD OF ATTORNEY'S FEES

The district court awarded Jiangsu $836,899.99 as attorney's fees and non-taxable costs. We outlined the path for fee calculation in *Intel Corp. v. Terabyte Int'l, Inc.*:

> When it sets a fee, the district court must first determine the presumptive lodestar figure by multiplying the number of hours reasonably expended on the litigation by the reasonable hourly rate. Next, in appropriate cases, the district court may adjust the 'presumptively reasonable' lodestar figure based upon the factors listed in *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 69-70 (9th Cir. 1975), that have not been subsumed in the lodestar calculation.

6 F.3d 614, 622 (9th Cir. 1993) (internal citations omitted). Although the district court did not parse out the lodestar calculation or the *Kerr* factors, its order first discussed and

rejected Tractel's arguments, and then adopted the lodestar calculation performed by Jiangsu. On appeal, Tractel raises again the arguments already rejected by the district court. The district court's analysis is amply supported by the record.

Tractel first claims that the rates charged by Jiangsu's attorneys—$320 to $685 per hour—exceeded prevailing rates. Jiangsu's attorneys explained that the rates "reflect a negotiated discount from market rates," and are "well within the range for comparably-experienced attorneys" because they "take into account the experience of the individual attorney, the geographic location of that attorney's practice, and publicly-available information concerning rates charged by similar law firms." The district court did not abuse its discretion in awarding the hourly rate.

According to the district court, the time spent by Jiangsu's attorneys was reasonable. Even though Jiangsu's attorneys tersely testified that the fees incurred were "reasonable and necessary" to defend against Tractel's claims, twenty-two months of discovery, including foreign language documents and multiple motions to compel, numerous transnational in-person depositions with interpreters, cross-motions for summary judgment, and a motion to exclude expert testimony, support the reasonableness of the time expended.[4]

Tractel also argues that the bills contain conclusory narratives.[5] Given the voluminous billing entries, spanning two

---

[4] Tractel's reliance on the design patent prompted the need for a patent attorney. Ivy Mei, an American patent attorney who speaks Mandarin, interfaced between domestic counsel and the non-English speaking defendant. Given her unique position, her fees were not unreasonable simply because she spent some of her time on logistics.

[5] The allegedly conclusory narratives include "teleconference with . . . ," "discuss case . . . ," "work with . . . ," "communicate with . . . ," "provide translation," and "SJM." The first four entries all list the individuals involved, and the remaining two, while not a model of clarity, are obvious in context. For instance, "SJM" appears to stand for Summary Judgment Motion.

years, the district court did not abuse its discretion in awarding fees for such entries, which are few in number. The same rationale applies to Tractel's claim that Jiangsu engaged in block billing. Though a small subset of the billing entries list numerous tasks performed over multi-hour spans, it was not an abuse of discretion for the district court to award the associated fees because counsel "is not required to record in great detail how each minute of his time was expended." *Hensley v. Eckerhart*, 461 U.S. 424, 437 n.12 (1983).[6]

**[16]** Finally, attorney's fees under the Lanham Act may also include reasonable costs that the party cannot recover as the "prevailing party." *See Grove v. Wells Fargo Fin. Cal., Inc.*, 606 F.3d 577, 580 (9th Cir. 2010) ("we repeatedly have allowed prevailing plaintiffs to recover non-taxable costs where statutes authorize attorney's fees awards to prevailing parties."). The district court awarded $83,229.49 for twelve such categories of costs, including "legal research," "deposition expenses," and "expert witness fee." Since no further details or itemization was provided, neither Tractel nor we can determine whether the costs were in fact reasonably incurred. The district court abused its discretion by failing to confirm their reasonableness, and also by failing to "determine whether it is the prevailing practice in the given community for lawyers to bill those costs separate from their hourly rates." *Id.* at 583. We remand to the district court to consider the reasonableness of these costs.

## IV. TAXABLE COSTS

**[17]** The district court awarded taxable costs associated with two interpreters after finding that in at least one instance, the "dialect of the first interpreter was not the same as that of the witnesses, and that the second interpreter played a 'vital role,' as she was able to communicate for the parties." The

---

[6]We acknowledge Tractel's multiple remaining arguments but are not persuaded the district court abused its discretion in calculating the fees.

related holding that the second interpreter was therefore necessary during all four depositions in December 2009 was therefore not an abuse of discretion. The district court did, however, abuse its discretion in reimbursing, as translation costs, expenses associated with an attorney providing informal translation services. Since there is no evidence that attorney Lam was qualified to provide translation services, her attorney's fees were not properly charged as "interpreter costs." The district court further abused its discretion by awarding an extra $738.90 in deposition costs that are not substantiated by the bills.

## CONCLUSION

**[18]** We affirm the district court's grant of summary judgment, its finding of exceptionality, and its award of attorney's fees under the Lanham Act. We reverse the district court's award of non-taxable costs and certain taxable costs and remand for further proceedings.

**AFFIRMED in part; REVERSED in part; and REMANDED.** Costs on appeal are awarded to Jiangsu.