This Opinion Is a
Precedent of the TTAB
Mailed:
November 16, 2012

**United States Patent and Trademark Office**

Trademark Trial and Appeal Board

———

*In re The Procter & Gamble Company*

———

Serial Nos. 77685045 and 77685052

———

Rene L. Guess of The Procter & Gamble Company.

N. Gretchen Ulrich, Trademark Examining Attorney, Law Office 113 (Odette Bonnet, Managing Attorney).

———

Before Bucher, Zervas and Shaw, Administrative Trademark Judges.

Opinion by Bucher, Administrative Trademark Judge:

The Procter & Gamble Company seeks registration on the Principal Register, for "mouthwash" in International Class 3, of the marks shown below, which consist of the overall contoured shape of a container for mouthwash and the design of the cap by itself:



[1] Application Serial No. 77685052 (the " '052 application") was filed on March 6, 2009, based upon applicant's allegation of a *bona fide* intention to use the mark in commerce. "The mark consists of the overall contoured configuration of a container for mouthwash having a wide downward arc at the base, with a long, tapered neck that flows into the form of the cap, widening at the top to create an undulating wave pattern along the edge. Color

The Trademark Examining Attorney refused registration under Sections 1, 2 and 45 of the Trademark Act, 15 U.S.C. §§ 1051, 1052 and 1127, on the ground that applicant's marks are merely non-distinctive product packaging for the goods. The Trademark Examining Attorney asserts that these trade dress marks are not unique or unusual in the



field of oral care products, but are mere refinements of commonly adopted forms of ornamental trade dress for such goods. She also refused registration in both applications, alleging that the designs of both the cap and the container are merely ornamental and that there is no showing of acquired distinctiveness.

After the Trademark Examining Attorney made the refusals final, applicant appealed to this Board. We reverse the refusals to register.

## I. Preliminary matters:

The Trademark Examining Attorney objected to applicant's discussion in its initial brief of several third-party registrations that applicant has conceded in its reply brief it inadvertently failed to attach to responses during the examination process. Applicant has indicated it is willing to withdraw these references as evi-

---

is not claimed as a feature of the mark." Applicant filed its Statement of Use (SOU) on March 1, 2010.

2 Application Serial No. 77685045 (the " '045 application") was filed on March 6, 2009, based upon applicant's allegation of a *bona fide* intention to use the mark in commerce. "The mark consists of the overall contoured configuration of a cap for a mouthwash bottle having a narrow base with sides that flare out towards the top and terminate in an undulating wave pattern around a recessed central core. Color is not claimed as a feature of the mark." Applicant filed its Statement of Use (SOU) on March 1, 2010.

dentiary support for registration herein, and we have given them no consideration.[3]

The Trademark Examining Attorney also objected to applicant's footnote reference in its appeal brief to an article from *The National Law Journal* entitled, "*Private-Label Versions: Free Enterprise or Freeloading?*" Applicant argues that this article was not intended to serve as evidence, but rather in the manner that a relevant case citation, an excerpt from a treatise, or a law journal article could be considered. We reject this analogy. The potential value to applicant of this article is not that it would provide a commentary on legal principles, but would have probative evidentiary value concerning a marketplace in which store brands mimic the trade dress of the national brands. Because it is being offered for its evidentiary value but was not properly introduced, we have given it no consideration.

Applicant has objected to the Trademark Examining Attorney's having attached to her appeal brief the copy of a non-precedential Board opinion, *In re Kason Indus., Inc.*, Application Serial No. 74691008 (TTAB August 17, 1999), because, *inter alia*, the drawing of the mark was not available in the attached copy of the *Kason* opinion. We note that although the Trademark Examining Attorney is not prohibited from citing to non-precedential opinions, the Board

---

[3] From early in the prosecution of these applications, the record contained several different photographs of third parties' products, for example, bottles of Listerine brand mouthwash. Referring to such photos, applicant mentioned the Listerine mouthwash bottle design as "the subject of Registration No. 2287138" (in its response of May 10, 2011) but never submitted a copy of the registration.

does not encourage this practice.[4] In addition to the fact that an opinion designated as not precedential is not binding upon the Board, absent a drawing of the complicated mechanical device in that case, its persuasive value is most limited. Finally, the opinion in that case is inapposite inasmuch as its relevance in this context is limited to a final refusal of utilitarian functionality for a product. Although the Trademark Examining Attorney earlier made a utilitarian functionality refusal as to this product packaging, it has since been withdrawn.

## II. Whether the Packaging is Inherently Distinctive

### *A. Inherent Distinctiveness of Product Packaging Generally*

The question before us is whether the overall product packaging, and the cap design, shown above, are each inherently distinctive. We analyze the refusal under the principles set forth in *Wal-Mart Stores v. Samara*.[5] Consistent with the teachings of the Supreme Court in *Wal-Mart Stores*, we presume that retail customers of many different products are "predisposed" through conditioning to regard packaging, containers and other features of trade dress as signals of the source of a particular product. In the following excerpt, following a discussion of Judge Friendly's classic formulation in *Abercrombie*[6] of the "spectrum of distinctiveness," the Court analogizes distinctive product packaging to a suggestive word mark (*i.e.*, inherently distinctive), rather than to a merely descriptive or generic term:

---

[4] *See* TRADEMARK TRIAL AND APPEAL BOARD MANUAL OF PROCEDURE (TBMP) §§ 101.03, 801.03, and 1203.02(f) (3d Ed. Rev. 1, 2012).

[5] *Wal-Mart Stores, Inc. v. Samara Bros., Inc.,* 529 U.S. 205, 54 USPQ2d 1065 (2000).

[6] *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 189 USPQ 759 (2d Cir. 1976).

… The attribution of inherent distinctiveness to certain categories of word marks and product packaging derives from the fact that the very purpose of attaching a particular word to a product, *or encasing it in a distinctive packaging*, is most often to identify the source of the product. Although the words and packaging can serve subsidiary functions -- a suggestive word mark (such as "Tide" for laundry detergent), for instance, may invoke positive connotations in the consumer's mind, and *a garish form of packaging (such as Tide's squat, brightly decorated plastic bottles for its liquid laundry detergent) may attract an otherwise indifferent consumer's attention on a crowded store shelf -- their predominant function remains source identification. Consumers are therefore predisposed to regard those symbols as indication of the producer, which is why such symbols "almost automatically tell a customer that they refer to a brand,"* "[*Qualitex Co.* v. *Jacobson Products Co.,* 514 U.S. 159, 162-63, 34 USPQ2d 1161 (1995)], and "immediately … signal a brand or a product 'source'" [*Qualitex Co.,* 514 U.S.] at 163. And where it is not reasonable to assume consumer predisposition to take an affixed word or packaging as indication of source -- where, for example, the affixed word is descriptive of the product ("Tasty" bread) or of a geographic origin ("Georgia" peaches) -- inherent distinctiveness will not be found. That is why the statute generally excludes, from those word marks that can be registered as inherently distinctive, words that are "merely descriptive" of the goods, Section 2(e)(1), 15 U.S.C. Section 1052(e)(1), or "primarily geographically descriptive of them," see Section 2(e)(2), 15 U.S.C. Section 1052(e)(2). In the case of product design, as in the case of color, we think consumer predisposition to equate the feature with the source does not exist. Consumers are aware of the reality that, almost invariably, even the most unusual of product designs -- such as a cocktail shaker shaped like a penguin -- is intended not to identify the source, but to render the product itself more useful or more appealing.

*Wal-Mart Stores,* 54 USPQ2d at 1068-69.

Beyond this presumption, there is specific support in the record for the proposition that indicia of product packaging, and specifically bottle designs, function as source indicators in the retail market for mouthwash products. The photographs of mouthwash bottles consistently demonstrate that frequently the purveyors of store brands adopt bottle designs, coloration and other visual indicia of trade dress quite similar to those of nationally-branded mouthwash products. In a real sense, such

discernible mimicry is a strong reinforcement that competitors marketing "compare-to" house brands – as well as the consumers whom they are targeting – perceive some source-indicating function in such indicia.

To determine whether product packaging is inherently distinctive, we consult the test formulated in *Seabrook Foods, Inc. v. Bar-Well Foods, Ltd.*, 568 F.2d 1342, 196 USPQ 289 (CCPA 1977).[7] Under *Seabrook Foods*, the three relevant factors that we consider in these circumstances are: (1) whether the packaging is a common basic shape or design, (2) whether it is unique or unusual in the particular field, and (3) whether it is a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods viewed by the public as a dress or ornamentation for the goods.[8] A finding that either the first or third of these factors *is* satisfied may render the marks not inherently distinctive; and a finding that the second factor *is not* satisfied also might contribute to a finding that the proposed marks are not inherently distinctive. However, Professor McCarthy has observed that "[i]n reality, all three [*Seabrook Foods*] questions are merely different ways to ask whether the design, shape or combination of elements is so unique, unusual or unexpected in this market that one can assume without proof that it will automati-

---

[7] The Supreme Court's decision in *Wal-Mart Stores* did not diminish the usefulness of the *Seabrook Foods* test as to cases presenting the question of the inherent distinctiveness of product packaging. *See e.g., In re Chippendales USA Inc.*, 622 F.3d 1346, 96 USPQ2d 1681, 1689 (Fed. Cir. 2010) ("Nothing in the *Wal-Mart* decision questioned or undermined the reasoning in *Seabrook*. Indeed, the Court cited *Seabrook* but did not express any disagreement with its use to determine the inherent distinctiveness of trade dress, although rejecting it as a test for inherent distinctiveness in the context of product design."); and *In re Brouwerij Bosteels*, 96 USPQ2d 1414, 1420-21 (TTAB 2010).

[8] Given the manner in which the product packaging design in *Seabrook Foods* differs from the involved configurations, the fourth *Seabrook Foods* factor — whether the packaging is capable of creating a commercial impression distinct from the accompanying words — is not relevant to this packaging case.

cally be perceived by customers as an indicia of origin – a trademark." 1 J.T. McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, Section 8.02 (4th ed. 2010). The focus of the inquiry is whether the trade dress is of such a design that a buyer will immediately rely on it to differentiate the product from those of competing manufacturers; if so, it is inherently distinctive. *See, e.g.*, *Tone Bros. Inc. v. Sysco Corp.,* 28 F.3d 1192, 31 USPQ2d 1321, 1331 (Fed. Cir. 1994), citing *Paddington Corp. v. Attiki Imps. & Distribs., Inc.,* 996 F.2d 577, 27 USPQ2d 1189, 1192-93 (2d Cir. 1993).

Thus, we are faced with two fact-specific determinations as to whether the cap and the overall design of applicant's mouthwash bottle are each so distinctive as to point to a single source or origin such that each should be registered as inherently distinctive.

### B. Inherent Distinctiveness of the Cap Design

The '045 application involves the contoured shape of a bottle cap having a narrow base with sides that flare out towards the top and terminate in an undulating wave pattern around a recessed central core. The first *Seabrook Foods* factor asks whether the involved trade dress is common generally: for example, does it employ a basic shape or design such as a letter or geometric shape? *See Brooks Shoe Mfg. Co., Inc. v. Suave Shoe Corp.,* 716 F.2d 854, 221 USPQ 536 (11th Cir. 1983). The cap is clearly not a common geometric shape such as a circle, oval, square or triangle. *See, e.g.*, *In re Creative Beauty Innovations Inc.,* 56 USPQ2d 1203, 1207-08 (TTAB 2000).

The second factor asks whether the symbol, here the cap, is common in the particular field of use. *See Wiley v. Am. Greetings Corp.,* 762 F.2d 139, 226 USPQ

101 (1st Cir. 1985) ("Using a red heart as ornamentation for stuffed animals is … far from unique or unusual … . [T]he record contains so many examples of use of a red heart motif on teddy bears and other stuffed animals, not to mention all manner of other toys and paraphernalia, that no reasonable argument on this point can be made."). The record shows in detail the flared, asymmetrical sides on the top portion of the bottle cap that terminate in an undulating wave pattern around a recessed central core of the cap.



This cap design was also prominently featured in Brand Packaging's "Design Gallery Volume 7" in 2009:

<div style="border:1px solid">

**SCOPE OUTLAST**

PROCTER & GAMBLE │ MULTINATIONAL

Mouthwash seems to have a common home in bathrooms: under the sink. P&G's new Scope Outlast was designed to get the product out from the cabinets and onto the bathroom counter. By having the product visible at all times, the idea is that consumers will remember to use it on a regular basis, increasing consumption of the brand.

*The unique shape of the bottle was created to appeal to young women. The bottle features a less medicinal-looking cap and more attractive shape. Its look was also meant to clearly differentiate Outlast* from other Scope mouthwashes.[9]

</div>

Most of the bottle caps shown in the record are wider at the base, or are generally cylindrical. The Examining Attorney highlights the upper portion of the ACT Fluoride Anti-Cavity Treatment bottle, having an ordinary cap positioned above the fill line on a molded reservoir built into the neck of the bottle, as shown below, to demonstrate that applicant's cap is similar. However, compared

---

[9] http://www.brandpackaging.com/, attached to applicant's response to Office action, dated May 10, 2011.

to applicant's bottle cap, this cap is rather commonplace. Although the "squeeze-meter" and reservoir built into the neck of the bottle may be different from other bottles, the form-fitting cylindrical cap is not unusual and does not resemble applicant's cap, which we find to be a unique and distinctive shape.



Based upon this record, we find that applicant's cap design is unusual for mouthwash bottle caps.

The third *Seabrook Foods* question asks whether the dress is a mere refine-ment of or variation on existing trade dress within the relevant field of use. Based on all the evidence of record, we find that the bottle cap as shown in these applica-tions is not a mere refinement of or variation on existing mouthwash caps.

Under the *Seabrook Foods* test, we find that the cap of the '045 application is sufficiently distinctive as to point to a single source and is entitled to registration on the Principal Register.

### C. Inherent Distinctiveness of the Bottle Design

We turn then to the overall contoured shape of applicant's mouthwash bottle, the subject of the '052 application. As with the bottle cap design, in evaluating this mark, again we are not faced with a common geometric shape. As described by ap-plicant, this bottle features a relatively narrow base, with a wide, downward arc at the base of a triangular "tear-drop" shaped core (almost resembling a smile), with a disproportionately long, tapered neck that flows up through vertical, parallel

lines into the cap. The intricacies of the design are apparent in twenty-one different images from applicant's United States Patent and Trademark Office Design Patent D591607, made a part of the record by applicant on May 10, 2011.

As seen above in our discussion of the bottle cap design, the bottle then widens at the top to create a reverse flare cap having a dramatically curved, wavy top edge.

We find that the bottle shape is not common for oral care products under the second *Seabrook Foods* factor.  Indeed, just the opposite is true:  the record indicates that this overall packaging design has won awards because it was considered unique. For example, it won a "Silver Winners Innovation" award for packaging as part of the 22nd annual ***du Pont*** packaging competition:

**Silver Winners Innovation**



Making a Great Brand Better – Revitalizing an Iconic Brand Through Innovative New Packaging *Scope "Outlast" Mouthwash from Procter & Gamble, Alpla, TechGroup, and Webb deVlam Industrial Designers – USA*

Proliferation of private labels in the oral care rinse category has made it very difficult to differentiate among brands on store shelves.

Procter & Gamble (P&G) recognized that the novel Scope Outlast formula needed equally compelling packaging to standout on the shelf.  P&G worked with its collaborators to create a new bottle shape and closure when launching new Scope Outlast Mouthwash.  Dubbed the "Genie" bottle, *the new design has outstanding stopping power and clearly separates Scope from private label and other offerings in the category*. … The company took a significant risk by radically changing an iconic brand and it has paid off with significant consumer impact plus operational efficiency.[10]

And as previously mentioned in our discussion of the cap design, applicant's bottle design was also prominently featured in Brand Packaging's "Design Gallery Volume 7" in 2009.

---

[10]  http://www2.dupont.com/Packaging_Resins/en_US/whats_new/article20100525.html, as attached to applicant's response to the First Office Action of October 19, 2010 (*emphasis* supplied).

The record contains additional articles taken from package design websites about the publicity surrounding the release of this particular container design, of which the following is representative:

> Webb Scarlett deVlam sent us their newest work for Scope Outlast mouthwash packaging (structural design). The design's main merit is in its structural form. This is probably the nicest-looking mouthwash bottle I've seen yet, and there's a good reason for making it so. According to Christine McGovern, brand manager for Scope, studies have shown most consumers tend to put their mouthwash under their cabinet. If the bottle design is elevated, people would be more inclined to leave it out on the counter in full view so they're more likely to use twice a day in their oral health regimen.
>
> We purposely put this product in a bottle that would speak to the consumer that this is something new and different. We really wanted to reinvent Scope with this," said McGovern. "We are also trying to drive more consumption. One of the things we've learned is that consumers tend to put the bottle underneath their cabinet so if you want consumers to use the product twice a day as part of their routine if it is out of sight it could be out of mind. Having a bottle that is counter-worthy can help drive more usage and consumption to help bring those extra sales to the marketplace."[11]

The record shows that the bottle design not only enhanced the appeal of the product, but served simultaneously to identify **P&G**'s **SCOPE OUTLAST** brand as well as to update consumers' associations with the **SCOPE** brand. When one compares this design with all the other alternatives available in the field of oral care products (whether pictured singly or displayed on supermarket shelves), we find the applied-for design (shown first below) to be unique in this field:

---

[11] http://www.thedieline.com/blog/2009/9/8/scope-outlast.html, as attached to Office Action of April 19, 2010.



The third question under the *Seabrook Foods* test (e.g., whether the design is a

mere refinement of or variation on existing trade dress within the relevant field of

use[12]) is not satisfied merely by showing that other mouthwash bottles employ

---

[12] In applying the *Seabrook Foods* test, we have considered dozens of images of bottles of mouthwash that were submitted for the record by the Trademark Examining Attorney and by applicant. In determining what is common or unusual for bottles in the particular field, we find, on the record in this case, the relevant market to be that of containers for mouthwash products. Given that the *Seabrook Foods* test refers to the "particular field" and "particular class of goods," we find that the designs of bottles for containing and dispensing liquids in other fields (*e.g.*, whether it be perfumery, ketchup, or salad dressings), and empty crystal decanters, are, on this record, irrelevant to our inquiry. *Seabrook Foods,* 196 USPQ at 291; *In re Data Packaging Corp.*, 453 F.2d 1300, 172 USPQ 396, 398 (CCPA 1972). We think that, to make out a *prima facie* case that the particular field or class of goods that is relevant under *Seabrook Foods* should be expanded beyond the most reasonable category that may be inferred from the market for the goods themselves (*e.g.*, here, the market for mouthwash in disposable containers), some evidence showing substantiality of the link between the two markets would be required. This could perhaps be shown, for instance, by evidence of the size of a particular alleged additional market and the degree of overlap between that market and the market for the specific goods at issue—although we are not foreclosing that other evidence could supply the basis for the substantial link. Here, however, the record contains no such evidence. Although the Trademark Examining Attorney points to multiple vendors offering online empty crystal decanters to be filled by the consumer with liquids, and specifically mouthwash, absent evidence from which we could reasonably conclude that this market ought to be part of our inquiry in this case, we do not view the mere availability of empty crystal decanters (*i.e.*, the configuration of a type of International Class 21 goods) as a sufficient factual predicate for considering such decanters here.

somewhat similar shapes or may have an elongated neck or a wide girth that tapers to a narrower base. In spite of the conclusory statements made by the Trademark Examining Attorney that this is a mere refinement of a well-known form of ornamentation for a mouthwash bottle, we agree with applicant that the Trademark Examining Attorney has failed to make of record any mouthwash bottle design that includes the unique contours, shapes, and proportions encompassed within applicant's mark. While some other bottles may have necks more narrow than their bottoms, we find that the Trademark Examining Attorney has not set forth a "reasonable predicate" for her position of no inherent distinctiveness, the standard required for the Office to make out a *prima facie* case that applicant's bottle design is not entitled to registration. *In re Pacer Technology*, 338 F.3d 1348, 67 USPQ2d 1629, 1632 (Fed. Cir. 2003).

We also see strong similarities between this case and an earlier decision of this Board involving a container design, *In re Creative Beauty Innovations Inc.*, 56 USPQ2d at 1207-08. The evidence in that case also included an article the applicant submitted from a packaging design publication, an award for the design, and third-party commentary about the distinctiveness of the bottle when compared to other containers. The  Board concluded that it was an uncommon design, was unique and unusual in the field of cosmetics, and not a mere refinement of existing designs. Similarly, in the case at hand, we find that both the design of the bottle cap and the overall bottle design for applicant's mouthwash are unique and unusual, and not mere refine-

ments of existing trade dress, and hence, we reverse the refusals to register these designs.

### D. *The Effect of Applicant's Design Patents*

We have, as urged by the Trademark Examining Attorney, considered the fact that applicant owns several design patents. The Trademark Examining Attorney argues, in part, that these designs cannot serve a source-indicating function because the design patents explicitly say they are "ornamental." Applicant responds that:

> [T]he Examining Attorney has confused the use of "ornamental" in the Patent Act with the use of "ornamental" as it relates to trademarks. The term "ornamental," as the term appears in the Patent Act, is used to identify the threshold for protectability of a design patent covering an article of manufacture, as contrasted with the "useful" threshold for protectability of a utility patent covering a process, machine, etc. See, 35 U.S.C. §§ 100, 171. Applicant is aware of no authority whatsoever, and the Examining Attorney has cited to no authority, which stands for the proposition that a design patent covering an applied-for mark automatically renders such mark merely ornamental and incapable of identifying the goods or services of the owner under Section 1, 2, and 45 of the Lanham Act. While a valid U.S. design patent may constitute evidence that the applied-for mark is ornamental in some way, it does not carry with it a presumption that the applied-for mark does not perform a source identifying function because it is merely ornamental.

We agree with applicant that these design patents do not carry with them a presumption that the applied-for marks do not perform a source-identifying function merely because the designs are described in the design patent documents as being ornamental. On the other hand, the Trademark Examining Attorney is correct in arguing that the fact that a device is or was the subject of a design patent does not, without more, result in said device being treated as inherently distinctive or *per se* functioning as a trademark. *In re Becton, Dickinson and Co.*, 675 F.3d

1368, 102 USPQ2d 1372 (Fed. Cir. 2012); *In re R.M. Smith, Inc.*, 734 F.2d 1482, 222 USPQ 1, 3 (Fed. Cir. 1984). *See also In re American Nat'l Can Co.*, 41 USPQ2d 1841 (TTAB 1997); and *In re Caterpillar Inc.,* 43 USPQ2d 1335 (TTAB 1997). On this record, we do not view the mere existence of the design patents as either supporting or disfavoring registration. *See also Secalt S.A. v. Wuxi Shenxi Const. Machinery Co.*, 668 F.3d 677, 101 USPQ2d 1553, 1557 (9th Cir. 2012) (a design patent "cannot do the whole job of proving inherent distinctiveness"), *quoting Krueger Int'l, Inc. v. Nightingale Inc.*, 915 F.Supp. 595, 40 USPQ2d 1334 (S.D.N.Y.1996) (Sotomayor, J.).

### *E. Conclusion:  The Cap and Bottle Designs are Inherently Distinctive*

In summary, we find the evidence of record to reveal that both the design of the bottle cap and the overall bottle design for applicant's mouthwash are unique and unusual, and not mere refinements of existing trade dress, and are thus inherently distinctive.

### III.   Ornamentation

The applications were also refused as consisting of merely decorative matter that is neither inherently distinctive nor had acquired distinctiveness. As noted by the Trademark Examining Attorney, TMEP § 1202.03 provides that "[s]ubject matter that is merely a decorative feature does not identify and distinguish the goods and, thus, does not function as a trademark."[13] But it further provides that "[m]atter that serves primarily as a source indicator, either inherently or as a result of acquired distinctiveness, and that is only incidentally ornamental or decorative,

---

[13] The section uses the terms "decorative" and "ornamental" interchangeably.

can be registered as a trademark." As noted in section II, *supra*, we have found that the bottle design and the cap design are both inherently distinctive, serve primarily as indicators of source, and, to the extent they are decorative or ornamental in nature, are only incidentally so. This finding necessarily requires reversal of the refusal to register based on mere ornamentation or decorativeness.[14]

    *Decision*: The refusals of registration are hereby reversed.

---

[14] We also note that the distinctiveness of a putative mark consisting of a product packaging should typically be analyzed under the framework set forth by the Supreme Court in *Wal-Mart Stores v. Samara,* 529 U.S. 205, 54 USPQ2d 1065 (2000), and by our primary reviewing court in *Seabrook Foods, Inc. v. Bar-Well Foods, Ltd.*, 568 F.2d 1342, 196 USPQ 289 (CCPA 1977); TMEP § 1202.02(b)(ii). Indeed, the "ornamentation" cases the Trademark Examining Attorney pulls from TMEP § 1202.03(f)(iii) are difficult, if not impossible, to apply to a putative mark consisting of the *shape* of a product's packaging — when those fact patterns involve a discrete "feature" of a package, such as: the outline shape of the back side of a blister pack for a 10" Vise-Grip locking wrench where the angular shapes at the top of the box are non-distinctive margins holding applicant's word mark and product descriptions, while the shaded squares on the lower portion represent the placement of illustrations of how the locking wrench pliers can be used, (e.g.,

 speed wrench, safe grinding, super pliers, emergency handle, all-purpose clamp, pipe wrench, etc.), *see In re Petersen Mfg. Co.*, 2 USPQ2d 2032 (TTAB 1987); the rose design that was merely a small portion of a larger floral blossom pattern drawn from the overall package surface of unlimited or undefined shape, all of which served as a background for the prominent word mark, used on packaging for toiletries ranging from cosmetics to perfumes, *see In re F.C.F. Inc.,* 30 USPQ2d 1825 (TTAB 1994); and a third applicant's package design for holiday decorations resembled gift wrapping that would not be perceived as a source indicator, *see In re J. Kinderman & Sons Inc.*, 46 USPQ2d 1253 (TTAB 1998). Thus, as explained above, to the extent that the concepts of TMEP §§ 1202.03 *et seq.* apply to this case, they are subsumed in the discussion in section II, *supra*.